IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2012 Session

## MELISSA BARNETT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Polk County**
**No. 10-092A   Carroll L. Ross, Judge**

**No. E2012-00855-CCA-R3-PC - Filed February 26, 2013**

The Petitioner, Melissa Barnett, appeals the Polk County Criminal Court's denial of her petition for a writ of error coram nobis regarding her convictions for first degree murder and conspiracy to commit first degree murder, for which she is serving a life sentence. The Petitioner contends that the trial court erred by denying her relief. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

R. Wylie Richardson, Cleveland, Tennessee, for the appellant, Melissa Barnett.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Robert Steven Bebb, District Attorney General; and M. Drew Robinson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the 1990 shooting death of Grady E. Barnett, Jr., for which the Petitioner and David Honey, her codefendant, were convicted. This court summarized the facts of the case in the appeal of the Petitioner's convictions:

> On the evening of December 12, 1990, the victim, Grady E. Barnett, was shot six times shortly after he entered his residence. It was stipulated that the victim died as a direct and proximate result of the gunshot wounds. The murder weapon, a .22 caliber rifle, was recovered from Melissa Barnett's bedroom.

Honey and Barnett had known each other for approximately one year. They began dating a month prior to killing the victim. Barnett told Honey that she wanted to kill her father; and she asked Honey to kill him. She wrote Honey a letter in which she stated: "So can we please do what we have talked about for the last few weeks?" She admitted that she was making reference to killing her father. During the course of the conspiracy, Honey and Barnett approached Honey's brother, Archie, and asked him to kill the victim. He declined the request. Honey asked a friend to help him kill the victim. The friend also declined the request. Subsequently, Honey and Barnett decided to kill the victim themselves.

On the afternoon in question, Honey and Barnett went to the victim's home, waited until he came home, and shot the victim six times with the murder weapon. The murder weapon was placed underneath the bed covers on Barnett's bed, they exited the residence through a window in the bedroom, and they ran to the front of the house.

The victim's cousin and neighbor, Avery A. Shelton, was taking wood inside his residence when he heard what appeared to be a gun discharging. He heard two shots. He then heard two more shots. While en route to the victim's residence, Shelton heard two more shots. He attempted to enter the residence after he saw the victim lying on the floor. The door was locked. He heard movement inside the residence. Shelton subsequently saw Honey and Barnett running around the corner of the residence. Barnett told Shelton: "Daddy's hurt" and "You need to see about him."

Shelton went to his mother's residence to call the police and an ambulance. Barnett entered the Shelton residence and told Shelton: "Daddy's still alive. He wants to talk to you." Shelton returned to the victim's residence. The victim told Shelton: "David shot me." The victim made an identical statement to Shelton's father and to a law enforcement officer. Barnett, who heard the statement made to Shelton, exited the residence and stated to Honey: "You shot dad."

Honey admitted that he and Barnett had discussed killing the victim on several occasions. However, he refused to participate in the murder. Furthermore, he did not know that Barnett intended to kill her father on the date in question. According to Honey, Barnett fired the weapon that killed the victim.

Barnett admitted that she discussed killing her father with Honey. However, she stated that it was just a joke.

The apparent motive for killing the victim was the proceeds of a life insurance policy on the life of the victim. Barnett was named beneficiary. Barnett also mentioned that she would inherit $100,000 from her father's estate if he died.

State v. David Honey and Melissa Barnett, No. 03-C-01-9202-CR-00042, slip op. at 3-4 (Tenn. Crim. App. Feb. 17, 1993), perm. app. denied (Tenn. June 1, 1993).

The Petitioner's codefendant received post-conviction relief and subsequently pleaded guilty to second degree murder. He was sentenced as a Range I, standard offender to twenty years' confinement. After learning of her codefendant's guilty plea, the Petitioner filed an untimely petition for post-conviction relief on May 10, 2004, the trial court dismissed the Petition, and this court affirmed the dismissal. Melissa Barnett v. State, No. E2004-02771-CCA-R3-PC, slip op. at 1-2 (Tenn. Crim. App. Dec. 5, 2005) (mem.), perm. app. denied (Tenn. May 30, 2006). The Petitioner conceded that her petition was untimely and requested the court toll the statute of limitations because she was not able to obtain a copy of the codefendant's guilty plea transcript until December 2003 showing that he pleaded guilty to second degree murder and admitted killing the victim. She argued that the guilty plea was newly discovered evidence and that the prosecution failed to disclose favorable evidence.

On November 20, 2009, the Petitioner filed a motion to reopen her post-conviction petition on the ground that her codefendant received post-conviction relief, pleaded guilty to second degree murder, and admitted killing the victim. She argued the codefendant's recantation and admission of guilt was newly discovered evidence. The motion was denied on January 26, 2010, and this court dismissed the appeal for failure to comply with the requirements for perfecting an appeal from a denial of a motion to reopen. The Petitioner now seeks coram nobis relief.

The original coram nobis petition was filed on June 10, 2010. The amended petition alleged her codefendant's admission of culpability during the guilty plea hearing was newly discovered evidence entitling her to relief. She argued that the codefendant recanted his trial testimony that he was only present during the shooting and that the Petitioner was the shooter. At the hearing, the Petitioner testified that after she and her codefendant were convicted, her codefendant was granted post-conviction relief. She said that in 2001 Assistant District Attorney General Sandra Donaghy came to see her at the Tennessee Prison for Women in Nashville, that Ms. Donaghy told her the codefendant had received a new trial, and that Ms. Donaghy asked if the Petitioner would testify against him at the new trial. She

said she agreed to testify at the new trial, but Ms. Donaghy never contacted her again. She said she was moved to Mark Luttrell Correctional Center in 2004.

The Petitioner testified that she learned her codefendant pleaded guilty to second degree murder around Christmas 2003. She said that while she was researching her case, she saw a document related to her codefendant. She said that she asked a courthouse employee to look at the court record and that she was told her codefendant received a new trial. She said that in late 2003 or early 2004, her grandmother was provided copies of the codefendant's post-conviction petition, the order granting him post-conviction relief and releasing him on bond pending trial, and the judgment showing that he pleaded guilty to second degree murder. She said she began filing pleadings for relief immediately after receiving copies of the documents.

The trial court received as an exhibit the transcript of the codefendant's guilty plea to second degree murder on August 13, 2001. According to the State's recitation of the facts,

> On December 12, 1990, this defendant along with the co-defendant, Melissa Barnett – who . . . was convicted of first degree murder in that first trial and is serving a life sentence . . . . The two were boyfriend and girlfriend. They planned to kill her daddy, Grady Barnett, Jr. On the day in question, he came home from work. The two of them, using a rifle, fired at him. He was shot five times. Law enforcement supposes or concludes that David fired the first two shots, knocking him down, but she then took the gun from him and finished him off. In a dying declaration, the daddy said, "David done it," which is consistent with being knocked down but not killed at that point. [T]he daddy saw David shoot him. They conspired – the motive according to our theory [was] . . . the insurance money. [H]er daddy had forbid them from being together. The defendants then locked the doors of the home and crawled out a back widow. There was an eyewitness neighbor that saw them crawl out the back window of the home, . . . [and] went to see what the gunshots were about. That happened in Polk County, Tennessee.

The trial court asked the codefendant if he was pleading guilty because he "did these things as alleged by the State," and defense counsel told the court the codefendant disputed many of the facts and always had disputed them. Counsel told the court that the codefendant recognized his culpability in the murder and wanted to enter a guilty plea because it was in his best interest. The trial court accepted his guilty plea and sentenced him to twenty years' confinement.

The trial court denied coram nobis relief. The court found that the guilty plea transcript showed no evidence that the codefendant recanted his trial testimony or that he made statements arising to newly discovered evidence. The court found that the codefendant's guilty plea was presented "in the posture" of a best interest plea and that no newly discovered evidence was contained in the guilty plea transcript. The court noted that the codefendant "denied any involvement whatsoever" in the murder at the trial, that he was subject to cross-examination by the Petitioner's counsel, and that the Petitioner chose not to testify at the trial. This appeal followed.

The Petitioner contends that the trial court erred by denying her petition for relief and argues that her codefendant's guilty plea to second degree murder was newly discovered evidence. The State responds that the petition was untimely and should be dismissed. Alternatively, the State argues the trial court did not err by denying relief. We agree that the petition was untimely and should be dismissed.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105 (2012); State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The decision to grant or deny such a writ rests within the sound discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for writ of error coram nobis must be filed within one year of the date the judgment becomes final in the trial court. T.C.A. § 27-7-103 (2000); State v. Mixon, 983 S.W.2d 661, 663 (Tenn. 1999); State v. Ratliff, 71 S.W.3d 291, 295 (Tenn. Crim. App. 2001). The only exception to the statute of limitations is when due process principles require tolling. Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001).

Despite the one-year statute of limitations, due process may require tolling of the limitations period if a petitioner seeks relief based upon newly discovered evidence of actual innocence. Harris v. State, 301 S.W.3d 141, 145 (Tenn. 2010); Workman, 41 S.W.3d at 101. "'Before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" Workman, 41 S.W.3d at 102 (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 2002)). Nevertheless, a petitioner seeking relief under the statute must exercise due diligence in presenting claims that fall outside the statute of limitations. Harris, 301 S.W.3d at 144; Mixon, 983 S.W.2d at 670.

Although not addressed by the trial court, the coram nobis petition was filed more than one year after the judgment became final. The Petitioner concedes that her petition for coram nobis relief was untimely and requests that this court toll the statute of limitations on due process grounds. The State contends that the Petitioner is not entitled to tolling the statute of limitations.

Our supreme court has said that determining whether due process requires tolling requires a three-step analysis in which the court must

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," Burford, 845 S.W.2d at 207, against the State's interest in preventing the litigation of "stale and fraudulent claims." Id. at 208.

State v. Sands, 903 S.W.2d 297, 301 (Tenn. 2005). The Petitioner's conviction became final on June 1, 1993, when the supreme court denied her application for permission to appeal. See State v. David Honey and Melissa Barnett, slip op. at 1. The record shows she learned of the codefendant's guilty plea in late 2003 or early 2004.

With respect to whether strict application of the statute of limitations would deny the Petitioner a reasonable opportunity to present the claim, the Petitioner sought post-conviction relief on the identical ground in May 2004, which was dismissed as untimely. This court affirmed the dismissal, and the supreme court denied her application for permission to appeal on May 30, 2006. The Petitioner sought to reopen her post-conviction petition over three years later on November 20, 2009. Nothing in the record explains why the Petitioner waited over three years to attempt to present her coram nobis claim. The opportunity to assert her claim was within her control after she learned of her codefendant's guilty plea in late 2003 or early 2004, and nothing prevented her from seeking coram nobis relief while the motion to reopen was pending. See Harris, 301 S.W.3d at 147. We conclude that the delay does not require tolling of the statute of limitations. See id. at 146-147 (concluding that a six-year delay after learning of new evidence did not require tolling of the statute of limitations on due process grounds).

In any event, the Petitioner characterizes the codefendant's guilty plea and admission of guilt as newly discovered evidence that shows the codefendant's testimony at the trial was false and that his statement during the guilty plea hearing was true. We disagree.

At the trial, the Petitioner's codefendant testified that he met the Petitioner one year before the victim's death and that they had been dating about four to six weeks at the time of the shooting. He denied killing the victim and said the Petitioner talked about killing the victim, who was the Petitioner's father. He said he heard the Petitioner state that she wanted the victim dead after an argument about her borrowing her father's car. He said the victim would not allow her to use the car. He said that the Petitioner was angry when she said she wanted the victim dead and that she acted crazy when she was angry. He denied saying anything to the Petitioner and said she asked him to kill the victim. He said he told her no.

The codefendant testified that two days later, the Petitioner asked him if he had thought about killing the victim and that he told the Petitioner no. He denied that the Petitioner threatened him. He said that the following day the Petitioner asked him if he would kill the victim and that he told her no. He said that the Petitioner continued asking him to kill the victim but that he refused. He said that two weeks before the killing, the Petitioner told him if he did not kill the victim, she would have Clay Higdon kill the victim and the codefendant because he knew about it. He said he knew who Mr. Higdon was but was not acquainted with him.

The codefendant testified that the Petitioner suggested possible methods of killing the victim, including throwing a radio into the victim's bath water and shooting the victim. He said that the Petitioner did not mention the victim's not wanting them to date anymore. He said that the night of the killing, he and the Petitioner were at her home, that she asked if he was going to kill the victim, and that he told her no. He said the Petitioner went into the living room, retrieved the gun, brought the gun into her bedroom, unloaded and loaded the gun, and said she was going to kill the victim. He said the Petitioner left the bedroom, walked down the hall, and began shooting. He said he followed her. He denied shooting the victim and said he saw the Petitioner shoot the victim.

The transcript of the guilty plea hearing shows that the codefendant did not admit killing the victim. He entered a guilty plea and told the court that he disputed many of the State's facts and had always disputed its theory of how the murder occurred. The codefendant told the court that he recognized culpability in the victim's murder and wanted to plead guilty because it was in his best interest. No evidence was presented at the hearing suggesting that the codefendant admitted killing the victim or that he made statements inconsistent with his trial testimony.

We conclude that due process does not require tolling of the statute of limitations and that the codefendant's guilty plea is not newly discovered evidence. Because the petition for relief was untimely and tolling of the statute of limitations is not required, the trial court properly dismissed the petition.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE